# United States Court of Appeals for the Federal Circuit

2008-5071

TAMERLANE, LIMITED, PARK TERRACE LIMITED,
PARK TERRACE EAST LIMITED,
and MULLICA WEST LIMITED,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

H. Robert Fiebach, Cozen O'Connor, Philadelphia, Pennsylvania, argued for plaintiff-appellant. With him on the brief was David M. Doret.

Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Gregory G. Katsas, Assistant Attorney General, Brian M. Simkin, Assistant Director, and Shalom Brilliant, Senior Trial Counsel.

Appealed from: United States Court of Federal Claims

Judge Christine O.C. Miller

# United States Court of Appeals for the Federal Circuit

2008-5071

TAMERLANE, LIMITED, PARK TERRACE LIMITED,
PARK TERRACE EAST LIMITED,
and MULLICA WEST LIMITED,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in
05-CV-677, Judge Christine O.C. Miller.

_____

DECIDED: December 22, 2008

_____

Before MICHEL, <u>Chief Judge</u>, LINN, <u>Circuit Judge</u>, and WARE, <u>District Judge</u>.[*]

WARE, <u>District Judge</u>.

In 2005, Appellants Park Terrace Limited ("Park Terrace") and Mullica West Limited ("Mullica") filed this lawsuit against the United States alleging, inter alia, that the government had breached loan contracts between itself and the parties. Appellants appeal from a final judgment of the United States Court of Federal Claims dismissing the lawsuit on the ground that the claims accrued in 1991 and 1992 and are, therefore,

---

[*] Honorable James Ware, District Judge, United States District Court for the Northern District of California, sitting by designation.

barred by the six-year statute of limitations of the Tucker Act. <u>Tamerlane, Ltd. v. United States</u>, 80 Fed. Cl. 724 (2008). We affirm.

## I. BACKGROUND

### A. Factual Background

#### 1. Mullica and Park Terrace Loans

Sections 515 and 521 of the Housing Act of 1949[1] provide for loans from the Farmers Home Administration of the United States Department of Agriculture ("FmHA") to further the government's interest in providing rental housing for low and moderate income persons. <u>See</u> <u>Franconia Assocs. v. United States</u>, 536 U.S. 129, 134 (2002). The loans have favorable interest rates and payment terms. Under the terms of the loans, borrowers agree to preserve the property developed with the FmHA funds for the use and occupancy of low to moderate income tenants "so long as the loan obligations remain unsatisfied." <u>Id.</u> The promissory notes associated with the loans contain provisions, however, allowing borrowers to prepay the loans at any time, after which they are free to charge market rate rents.

On May 31, 1977, and on November 30, 1977, Appellant Mullica[2] entered into FmHA loan contracts totaling over $3 million. The loans have a forty-year maturity period, and are due in 2017. The loan contracts contain the commitment to preserve the property developed with the FmHA funds for the use and occupancy of low and moderate income tenants for the life of the loan but permit Mullica to prepay the loans "at any time at the option of Borrower."

---

[1] 76 Stat. 671, 82 Stat. 551, codified as amended, 42 U.S.C. §§ 1485, 1490a.

[2] Mullica is a New Jersey limited partnership that used its FmHA loans for a 168-unit rental property.

On July 28, 1978, Appellant Park Terrace[3] entered into loan contracts with FmHA, which permitted Park Terrace to take out two loans in the amounts of $850,000 and $125,000. Final payments on the loans are due on July 28, 2028. The contracts contain a commitment by Park Terrace to restrict use of the rental property and "related facilities for eligible occupants" for the life of the loan but expressly permit Park Terrace to prepay the loan "at any time at the option of the Borrower."

### 2. Passage of ELIHPA and HCDA

In the years after these and many other similar loans were made pursuant to sections 515 and 521 of the Housing Act, Congress became concerned that increasing numbers of the loans were being prepaid, thus decreasing the available amount of housing for low-to-moderate income occupants. See Franconia, 536 U.S. at 135-36. In light of these concerns, Congress passed the Emergency Low Income Housing and Preservation Act of 1987 ("ELIHPA")[4] and the Housing and Community Development Act of 1992 ("HCDA").[5] ELIHPA "amend[s] the Housing Act of 1949 to impose permanent restrictions upon prepayment of § 515 mortgages entered into before December 21, 1979." Id. at 136. ELIHPA mandates that before the FmHA can accept prepayment of a section 515 mortgage,

> the [FmHA] shall make reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding commitment to extend the low income use of the assisted housing and related facilities for

---

[3]    Park Terrace is a Pennsylvania limited partnership that used its FmHA loans for a forty-five unit rental property.

[4]    Pub. L. No. 100-242, 101 Stat. 1877 (1988).

[5]    Pub. L. No. 102-550, 106 Stat. 3672 (codified in relevant part at 42 U.S.C. § 1472(c)).

not less than the 20-year period beginning on the date on which the agreement is executed.

42 U.S.C. § 1472(c)(4)(A).

ELIHPA provides that "the FmHA may include incentives in such an agreement, including an increase in the rate of return on investment, reduction of the interest rate on the loan, and an additional loan to the borrower." Franconia, 536 U.S. at 136 (citing 42 U.S.C. § 1472(c)(4)(B)). If, however, after a "reasonable period" an agreement cannot be reached between the borrower and the FmHA, the borrower seeking prepayment must "offer to sell the assisted housing and related facilities involved to any qualified nonprofit organization or public agency at a fair market value." 42 U.S.C. § 1472(c)(5)(A)(i). An offer of prepayment may be accepted if such an offer to buy the property is not made within 180 days.[6] Id. § (c)(5)(A)(ii). The regulations implementing ELIHPA create a process for the FmHA's determination of prepayment requests, by which the FmHA "'develops an incentive offer,' making a 'reasonable effort . . . to enter into an agreement with the borrower to maintain the housing for low-income use that takes into consideration the economic loss the borrower may suffer by foregoing [sic] prepayment.'" Franconia, 536 U.S. at 137 (quoting 7 C.F.R. § 1965.210 (2002)). If no such agreement can be reached, the FmHA will proceed to make the requisite statutory determinations before any prepayment can be accepted. Id.

### 3. Mullica and Park Terrace Prepayment Requests

On October 11, 1988, Mullica sent a letter to the FmHA stating, "[t]his letter will serve as a request to pay off the remaining mortgage balance for [Mullica West

---

[6] Under certain circumstances, not relevant to the facts of this case, the offer-for-sale requirement may be avoided. See 42 U.S.C. § 1472(c)(5)(G).

Apartments]." On March 30, 1989, the FmHA responded that, "[a]fter careful consideration, [the FmHA] is unable to accept your offer to prepay the loan on Mullica West Apartments at this time." The letter further advised Mullica of its right to participate in an appeal process and of "the opportunity to review any incentives not to prepay."

On March 14, 1991, the FmHA informed Mullica that, "[b]ased on the material submitted, [Mullica had] demonstrated the ability to pay [its] loan in full." "As a result of this ability," the FmHA offered Mullica an incentive loan package that required Mullica to sign "a restrictive-use provision obligating the housing to low and moderate income use for 20 years."

After further correspondence, on June 18, 1991, Mullica took out an FmHA incentive equity loan. Mullica's incentive loan agreement provides:

> The borrower and any successors in interest agree to use the housing for the purpose of housing very low-, low- and moderate-income people eligible for occupancy as provided in FmHA regulations then extant during this 20 year period beginning on the date of this mortgage instrument. . . . No person occupying or wishing to occupy the housing shall be required to vacate or be denied occupancy prior to the close of such 20 year period because of early repayment.

The "20-year use restrictions" of the incentive loan obligate Mullica to maintain the financed housing for low-to-moderate income renters until 2011. Mullica's incentive loan matures in 2036.

On November 19, 1991, Park Terrace sent a letter to the FmHA stating, "[t]his letter will serve as a request to pay off the remaining mortgage balance for the [Park Terrace Apartments]." The FmHA responded on June 23, 1992, with a letter stating, "[i]n conjunction with your prepayment request, we are making you . . . a one-time offer

of an equity loan. . . . as an incentive to keep Park Terrace in low income housing . . . Any agreement entered into to accept this incentive will require you to sign a restrictive-use provision obligating the housing to the low-moderate income program for 20 years."

On July 16, 1993, after an ensuing application process, Park Terrace took out a new incentive equity loan in the amount of $925,000, which carried a low fixed interest rate. Park Terrace's incentive loan matures in fifty years. The Park Terrace incentive loan agreement contains the following clause:

> The borrower and any successors in interest agree to use the housing for the purpose of housing low- and moderate-income people eligible for occupancy as provided in Section 515 of Title V of the Housing Act of 1949 and FmHA regulations then extant during this 20 year period beginning the date of this mortgage. . . . No person occupying or wishing to occupy the housing shall be required to vacate or be denied occupancy prior to the close of such 20 year period because of early repayment.

The "20-year use restrictions" of the incentive loan obligate Park Terrace to maintain the housing for low and moderate income renters until 2013. The Park Terrace incentive loan matures in 2043.

## B.    Procedural History

On June 22, 2005, Park Terrace, Mullica and two other borrowers[7] filed a Complaint in the United States Court of Federal Claims, alleging breach of contract and a "takings" claim, and seeking damages for lost profits for the period ELIHPA prevented them from converting their properties from low-moderate income housing to market-rate rental housing. The Complaint alleged that, by denying Plaintiffs the opportunity to prepay the FmHA loans in direct violation of the express terms of their respective loan

---

[7]    The original plaintiffs were Tamerlane, Ltd. and Park Terrace East, Ltd., as well as Park Terrace and Mullica.

agreements, the government, through ELIHPA, unlawfully tied Plaintiffs to the use restrictions contained in those agreements.

In its Answer, the government alleged, as an affirmative defense, that the claims of Park Terrace and Mullica[8] were barred by the statute of limitations contained in the Tucker Act.[9] The government contended that the claims alleged in Mullica and Park Terrace's 2005 Complaint had accrued when the FmHA denied their offers of prepayment in 1991 and 1992, respectively, and on that ground, the government moved for judgment on the pleadings. In response, Mullica and Park Terrace contended that (1) their prepayment requests did not trigger the statute of limitations or, alternatively, (2) that even if the statute was triggered and had run on the 1991 and 1992 prepayment offers, the statute has not extinguished any claim that they might bring for failure of the government to allow prepayment in the so-called "extended period," referring to the period of time in the future between the end of the twenty-year use restrictions contained in the incentive loans and the date the original loans mature.[10]

---

[8] Statute of limitations was not raised as an affirmative defense as to Tamerlane or Park Terrace East.

[9] The Tucker Act empowers the Court of Federal Claims "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States. . . ." 28 U.S.C. § 1491(a)(1). With respect to the statute of limitations for such claims, the Act provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501.

[10] Specifically, Park Terrace's original loan matures in 2028, but the use restriction contained in Park Terrace's 1993 incentive loan ends in 2013. Mullica's original loan matures in 2017, but the use restriction contained in Mullica's 1991 incentive loan ends in 2011. Accordingly, there is a fifteen-year gap between the end of Park Terrace's use restriction and the maturity of its original loan, and a similar six-year

In response to the government's motion for judgment on the pleadings, the Court of Federal Claims issued the first in a series of three orders.

### 1. Tamerlane I

On May 18, 2007, the Court of Federal Claims issued an order and opinion on the government's motion for judgment on the pleadings.[11] Tamerlane, Ltd. v. United States, 76 Fed. Cl. 512 (2007) ("Tamerlane I"). Based on the holding in Franconia, the court found that Park Terrace and Mullica's prepayment requests and the government's subsequent offers of incentive equity loans accrued the government's breach of the underlying loan agreements. Id. at 523. Accordingly, the court held that Mullica's claim had accrued in 1991 and Park Terrace's in 1992. With respect to the extended period claims, the court held that the claims were unaccrued as unvested prepayment rights. Id.

After the Court of Federal Claims issued its order in Tamerlane I, Park Terrace and Mullica asked the court to reconsider the statute of limitations issue, as well as for permission to take documentary discovery with respect to their claims on the primary loan periods. The court granted those motions.

### 2. Tamerlane II

On February 29, 2008, the Court of Federal Claims issued its definitive opinion on Mullica and Park Terrace's claims. Tamerlane, Ltd. v. United States, 80 Fed. Cl. 724 (2008) ("Tamerlane II"). Since matters outside of the pleadings had been presented for consideration, the Court of Federal Claims treated the motion as one for summary

gap between the end of Mullica's use restriction and the maturity of its original loan. These are the so-called "extended periods."

[11] In Tamerlane I, the court treated the government's motion as one for summary judgment because it relied on matters outside of the pleadings.

judgment. The court affirmed the holding of its <u>Tamerlane I</u> opinion with respect to accrual of the statute of limitations in 1991 and 1992. <u>Id.</u> at 735.

With respect to the viability of Appellants' claims in the so-called extended period, in <u>Tamerlane II</u>, the court found that those claims should be considered in the context of the continuing claims doctrine. <u>See</u> 80 Fed. Cl. at 735-37. The court reversed its earlier finding on this issue, and held that "[w]hile Park Terrace and Mullica seek compensation for a contractual right that promised performance into the future . . . a single repudiation made clear the [g]overnment's intent to dishonor the terms of the contract." <u>Id.</u> at 737. Accordingly, the court held that "[a]ny subsequent or continuing denial by the government of responding to plaintiffs' rights to prepay their loans and exit the program pursuant to ELIHPA does not give rise to a new cause of action, but flows from the government's original repudiation and later breach occurring in 1992 and 1991." <u>Id.</u> Thus, in reversing its <u>Tamerlane I</u> finding on the extended period claims, the court determined that these claims were also barred by the six-year statute of limitations.

### 3. <u>Tamerlane III</u>

After both primary period and extended period claims were dismissed by the Court of Federal Claims in <u>Tamerlane II</u>, Park Terrace and Mullica filed a motion to amend judgment, solely with respect to the extended period claims. On April 3, 2008, the court issued its Order on Motion to Amend Judgment. <u>Tamerlane, Ltd. v. United States</u>, 81 Fed. Cl. 511 (2008) ("<u>Tamerlane III</u>"). The court found that Plaintiffs' "motion

appear[ed] to advance claims for breach of the incentive equity loan contracts"[12] and not just breach of the original pre-1979 loan agreements. Id. at 513. The court held that the parties' "June 22, 2005 complaint is not reasonably susceptible [to] amendment to assert breach of contract claims with respect to the incentive equity loans, as such claims would appear to state separate and independent causes of action." Id. at 513 n.1. Accordingly, the court denied the motion to amend judgment as to the extended period claims. Id. at 513-14.

This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II.  DISCUSSION

### A.  Standard of Review

We review judgments of the Court of Federal Claims de novo with respect to questions of law, and for clear error with respect to findings of fact. Applegate v. United States, 25 F.3d 1579, 1581 (Fed. Cir. 1994); Milmark Servs., Inc. v. United States, 731 F.2d 855, 857 (Fed. Cir. 1984). A grant of summary judgment is reviewed "for correctness, determining whether the matter was amenable to summary resolution and, if so, whether the law was correctly applied to undisputed facts." Mass. Bay Transp. Auth. v. United States, 129 F.3d 1226, 1230-31 (Fed. Cir. 1997).

### B.  Analysis

Appellants contend that the Court of Federal Claims (1) erroneously determined the date of accrual of Appellants' breach of contract claims, and (2) erred in failing to

---

[12]  In Plaintiffs' motion to amend judgment, Plaintiffs contended that the court's dismissal of their "extended period" claims "deprived [them] of a remedy for the breach of the second contract, which came into existence only _after_ the putative demand and refusal to perform had accrued the rights to sue for the breach of the first."

allow Appellants leave to amend their Complaint to add claims under the incentive loans for the extended period. We consider each issue in turn.

## 1. Occurrence of Breach

Appellants contend that the Court of Federal Claims erred as a matter of law by misapplying the Supreme Court's governing <u>Franconia</u> precedent to the transactions at issue in this case. According to Appellants, the Court of Federal Claims erroneously found that Appellants' acceptance of the use restrictions in the incentive loans accrued their breach of contract claims, and, in doing so, "erroneously disregarded the textual limitations of the operative documents relied on by the government, as well as their pro forma nature and the artificiality of the process in which they were generated."

In <u>Franconia</u>, the Supreme Court held that ELIHPA's enactment "qualified as a repudiation of the parties' bargain, not a present breach of the loan agreements." 536 U.S. at 133. As a consequence, "breach would occur when a borrower attempted to prepay, for only at that time would the [g]overnment's responsive performance become due." <u>Id.</u> at 143. In other words, the "time of accrual [of a claim] depends on whether the injured party chooses to treat the repudiation as a present breach." <u>Id.</u> at 144. The six-year statute of limitations commences "when a borrower tenders prepayment and the [g]overnment then dishonors its obligation to accept the tender and release its control over use of the property that secured the loan."[13] <u>Id.</u> at 133.

The main thrust of Appellants' contentions is that the Court of Federal Claims erred as a matter of law by misapplying <u>Franconia</u>'s requirement of tender of

---

[13] ELIHPA can also be treated as a present breach by filing suit prior to the date indicated for performance. <u>Franconia</u>, 536 U.S. at 143.

prepayment and rejection by the government.  In particular, Appellants take issue with the Court of Federal Claims' treatment of

> the acceptance of the twenty-year use restriction as tantamount to the government's rejection of a demand for performance, [when it held] that the [g]overnment's offer of incentives in exchange for an agreement by borrowers to extend the restrictions on their properties constitutes precisely the breach and accrual that Franconia contemplated.

In Franconia the Court did not define the contours of the tender and rejection that are sufficient to trigger the six-year statute of limitations.  We now clarify whether the circumstances of this case were sufficient to constitute a breach under Franconia.

### a.	The text of the operative documents

Appellants contend that the operative documents relied on by the Court of Federal Claims neither tendered prepayment nor rejected tender.  The letters submitted to the FmHA in 1988 by Mullica and in 1991 by Park Terrace each state that "[t]his letter will serve as a request to pay off the remaining mortgage balance for the above property."  Appellants' contention that this does not constitute "tender" within the meaning of Franconia relies on the definition of "tender" from Black's Law Dictionary 1477-80 (4th ed. 1999), which states that "tender" is "an unconditional offer of money or performance to satisfy a debt or obligation."  Appellants also look to Williston on Contracts, which defines "tender" as "an unconditional offer of payment consisting of an actual production of a sum not less than the amount due on a particular obligation."  § 72.27 (4th ed. 2007).  Appellants assert that the 1988 and 1991 letters did not constitute "tender," because they were only "requesting the right to pay" in a perfunctory manner and did not actually tender money or assert a demand to release the property from the use restrictions.

2008-5071	12

Although the Supreme Court did speak in terms of "tendering payment" in Franconia, the Franconia decision is not authority for "tender" being satisfied only by the highly formalized and technical process advanced by Appellants. See 536 U.S. at 133. The Franconia Court also stated that "breach would occur when a borrower attempt[s] to prepay" and that the government's obligation was ultimately to "accept prepayment." Id. at 143. The Franconia opinion does not suggest that a physical transfer of money must be attempted in order to constitute a tender of payment.

Under the terms of the original loans, Mullica and Park Terrace had an unconditional right to prepay the loans at any time, and the government had a corresponding unconditional obligation to accept prepayment. The 1988 and 1991 letters sent by Mullica and Park Terrace to the government were clear, unconditional offers of prepayment sufficient to trigger a duty by the government to accept the tender under the terms of the pre-1979 loans.

In the alternative, Appellants contend that even if the letters requesting to prepay the loans are regarded as tenders, the government's response letters were not rejections sufficient to trigger breach under Franconia.

The government's responses to Mullica and Park Terrace did not explicitly state that the offers of prepayment were "rejected."[14] However, the government did not

---

[14] With respect to Mullica, the government's initial response letter on March 30, 1989, declared that "[a]fter careful consideration, [FmHA] is unable to accept your offer to prepay the loan on Mullica West Apartments at this time." In a subsequent letter on March 14, 1991, the government stated:

Based on the material submitted, it is the determination of [FmHA] that you have demonstrated the ability to repay your loan in full. As a result of this ability, FmHA is offering a package of one-time incentives so that you

accept those offers. Pursuant to ELIPHA, instead of accepting prepayment, the government offered incentive loans. ELIHPA provides that, in lieu of accepting prepayment, the government make "reasonable efforts to enter into an agreement with the borrower," by which the borrower would be offered incentives to keep the property committed to low-income uses. See 42 U.S.C. § 1472(c)(4)(A)-(B). In other words, by offering incentive loans in response to Appellants' requests for prepayment, the government necessarily rejected the tender and breached its obligation to accept prepayment at any time. This conclusion is reinforced in the case of Mullica, given that the government's offer of incentives was preceded by a letter in which the government expressly declined to accept prepayment.

The degree of formalism in communications for which Appellants advocate is unnecessary given Congress' clear repudiation of the unfettered right to prepay in ELIPHA. When the government responded to Appellants' requests to prepay with offers of incentive loans, those offers were functionally co-extensive with a rejection of prepayment. The Franconia decision requires no more formalism than the written request to prepay followed by non-acceptance of the request by the government to trigger the running to the statute of limitations. Although other conduct could constitute breach by the government, the Court of Federal Claims correctly ruled that at least by

> may remain in the FmHA multiple family housing loan program in order to extend the low income use of the housing.

Similarly, the government responded to Park Terrace on June 23, 1992, with a letter stating that, "[i]n conjunction with your prepayment request, we are making you . . . a one-time offer of an equity loan . . . as an incentive to keep Park Terrace in low income housing."

1991 and 1992, the dates the Appellants entered into ELIPHA incentive loans, breach-triggering rejections had occurred.

### b. The context surrounding the operative events

Relatedly, Appellants contend that the Court of Federal Claims erred by refusing to consider evidence concerning the context of the actions that it held had accrued the claims. The primary thrust of this contention is that the requests for prepayment were "pro forma" and were part of a "charade" designed to secure incentives in lieu of insistence on prepayment. In other words, Appellants contend that the prepayment letters were just part of a mechanical process to get incentives, and were never intended to declare the government in breach of the underlying loan agreements.[15]

In support of this theory, Appellants cite a number of government documents that speak in terms of "incentives to avert prepayment" of the FmHA loans. Appellants also rely on FmHA Guidelines for Accepting Prepayment in Order to Ensure Tenant Protections, which state:

> [E]very borrower who requests to prepay, and can document the ability to prepay, will be offered an incentive not to do so. The size of the incentive will be based on whether this housing is needed by current tenants and other low- and moderate-income people in the market area, and on the loss to the borrower by remaining in the FmHA program. The size of the incentive may not be based on whether the borrower actually wishes to prepay or wishes to receive an incentive not to repay, or on whether the borrower is a servicing problem.

Appellants suggest that this passage from the Guidelines evidences a "charade"

---

[15] We reject this argument because it appears to rely on the subjective intent of the parties with respect to whether there was a "tender." As with general contract principles, the subjective intent of the parties is immaterial to whether a contract has been breached. See Navair, Inc. v. IFR Ams., Inc., 519 F.3d 1131, 1138-39 (10th Cir. 2008). Appellants fail to cite any authority for the proposition that the determination of performance or breach of a contract is based on the subjective intent of the parties.

because of its reference to offering incentive loans under circumstances where the borrower might not actually wish to prepay but offers to do so in order to qualify for an incentive loan. Appellants are misreading the Guidelines. The cited language instructs that the "size" of the incentive should be independent of the motivation or payment history of the borrower and does not transform the process into a charade.

Further, Appellants' assertions that their prepayment requests and the government's response letters were "mere paperwork" in the context of a charade, in which they never intended to call the government into breach, are undermined by the allegations in their own Complaint. For example, the Complaint alleges:

> But for the [g]overnment's conduct, plaintiffs would have terminated their contracts by prepaying their mortgage loans. As a consequence of the [g]overnment's conduct, certain of the plaintiffs have submitted applications for prepayment and/or an offer of "incentives" from the [g]overnment. The [g]overnment has in every instance refused to accept prepayment from plaintiffs pursuant to the provisions of their contracts. Those plaintiffs have been compelled to change their position to their detriment in reliance upon the [g]overnment's repudiation, including accepting "incentives" in lieu of a sale at fair market value.

The allegations in the Complaint suggest both that Appellants desired to prepay their FmHA loans and that their requests to do so were rejected by the government. The Complaint speaks of the incentives as a form of detrimental reliance, not as something Appellants sought to secure in the absence of any attendant desire to repay their loans.

Accordingly, we affirm the Court of Federal Claims' determination that the transactions underpinning Appellants' acceptance of incentive loans triggered breach of the original loan agreements and commencement of the six-year statute of limitations. As a consequence, the six-year statute of limitations expired in 1997 for Mullica and in 1998 for Park Terrace.

## 2. Claims during the extended period

Appellants alternatively contend that the Court of Federal Claims erred as a matter of law by misapplying <u>Franconia</u> to the so-called "extended period" and abused its discretion by not granting Appellants' request to amend their Complaint to add extended period claims. Appellants' "extended period" contention appears to involve two distinct periods: (1) the term of the pre-1979 loans that will remain unexpired following the end of the twenty-year use restrictions agreed upon by Appellants in the incentive loans, and (2) claims based on breach of the incentive loans themselves.

### a. Claims under the pre-1979 loans during the extended period

As described above, the twenty-year use restriction of the incentive loan obligates Mullica to maintain the financed housing for low-to-moderate income renters until 2011. However, the incentive loan did not supplant the pre-1979 loans to Mullica and the restrictions are in effect until 2017.

Similarly, the twenty-year use restriction of the incentive loan obligates Park Terrace to maintain the housing for low and moderate income renters until 2013. Concurrently, the original 1978 FmHA loans to Park Terrace are still outstanding and restrict use for eligible tenants until 2028.

Appellants contend that, even if there were tender and rejection of prepayment when Appellants took the incentive loans, the bar of the statute of limitations should only extend to the end of the twenty-year restriction period because any rejection of prepayment occurred only to the extent of the use restriction. Appellants assert that new opportunities to prepay the original loans occur between 2011 and 2017 as to Mullica, and between 2013 and 2028 as to Park Terrance, because during those

periods the use restrictions will have expired, which Appellants contend necessarily implies a new opportunity for breach through tender and rejection.

The Court of Federal Claims analyzed Appellants' contention, namely, that a new limitations period arose for any refusal to allow prepayment, under the continuing claims doctrine. This doctrine applies where a plaintiff's claim is "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." Brown Park Estates-Fairfield Dev. Co. v. United States, 127 F.3d 1449, 1456 (Fed. Cir. 1997). The doctrine allows "later arising claims even if the statute of limitations has lapsed for earlier events."[16] Tamerlane II, 80 Fed. Cl. at 736 (quoting Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 879 (Fed. Cir. 1998)). The Court of Federal Claims found that the continuing claims doctrine was inapplicable to Appellants' alleged "extended period" because "a single repudiation made clear the [g]overnment's intent to dishonor the terms of the contract" and that "[a]ny subsequent or continuing denial . . . of [Appellants'] right to prepay their loans . . . does not give rise to a new cause of action, but flows from the [g]overnment's original repudiation and later breach occurring in 1992 and 1991." Tamerlane II, 80 Fed. Cl. at 737.

We find that the Court of Federal Claims correctly determined that Appellants have no remaining viable claim for a failure to allow prepayment of the original pre-1979 loans in the extended period or otherwise. As Franconia held, the enactment of ELIHPA constituted a repudiation of Appellants' FmHA loan agreements. Breach of those agreements arises upon tender of prepayment and subsequent government

---

[16] Appellants themselves do not expressly rely on the "continuing claims doctrine."

rejection of that attempted prepayment. 536 U.S. at 143. Franconia in no way tied the breach of the original contract to the terms of a subsequent incentive contract. In this case, Appellants appear to improperly conflate the government's breach of the original loan agreements with the use restrictions that arose from the incentive loan agreements. That is, there is no second opportunity for breach of the original agreements just because the incentive agreements contain time-limited use restrictions. As the Court of Federal Claims correctly found, there was a single agreement that was breached on a single occasion, which does not allow any sort of "continuing claims" to be brought under the prevailing law of this Circuit.[17]

### b. Claims under the incentive loan agreements

Appellants contend that the Court of Federal Claims erred in its ruling with respect to dismissing their claims for breach of the incentive loans during the so-called extended period. The claims on account of the extended period seek relief for the breach of the right to prepay the incentive loans after the twenty-year restriction period expires.

In addressing Appellants' contention with respect to an alleged breach of the incentive loans, the Court of Federal Claims clearly stated that its "opinions do not purport to dismiss any claims asserting breach of incentive equity loan contracts, as the complaint did not plead those claims." Tamerlane III, 81 Fed. Cl. at 513 n.2.

---

[17] This situation is analogous to that in Ariadne, where we were confronted with a plaintiff who sought compensation from the government for repudiation of a contract that promised continuing performance into the future. 133 F.3d at 879. In finding that a single statutory repudiation made clear the government's intent to reject the terms of the contracts, we held that each subsequent denial of the promised contractual benefits did not give rise to a separate cause of action, and found that the continuing claims doctrine did not permit the plaintiff to obtain a second limitations period where the limitations period on the original breach had already expired. Id.

We find that the Court of Federal Claims correctly ignored Appellants' contentions relating to an alleged breach of the incentive loans. Appellants' Complaint does not make any allegations relating to the incentive loans.[18]

Accordingly, the Court of Federal Claims' failure to address Appellants' extended period claims based on the incentive loans is affirmed.

### c. Leave to amend Appellants' Complaint

Finally, Appellants contend that the Court of Federal Claims erred by not permitting them to amend their Complaint to include claims for the extended period. From Appellants' papers, however, it is not clear to which extended period they are referring. Treating the proposed amendment as applying to the incentive loans, the Court of Federal Claims found that the Complaint was "not reasonably susceptible [to] amendment to assert breach of contract claims with respect to the incentive equity loans, as such claims would appear to state separate and independent causes of action." Tamerlane III, 80 Fed. Cl. at 513 n.1.

"The decision to grant or deny a motion for leave to amend . . . lies within the sound discretion of the trial court." Insituform Techs., Inc. v. Cat Contracting, Inc., 385 F.3d 1360, 1372 (Fed. Cir. 2004). We find that there was no abuse of discretion by the Court of Federal Claims in denying leave to Appellants to introduce separate and independent causes of action. Accordingly, the Court of Federal Claims' denial of leave to amend is affirmed.

---

[18] Appellants seem to misapprehend the law in this regard, as they state in their brief that, "[s]ince the [g]overnment will deny the right of prepayment when the restrictions expire in 2013 and 2011, the filing of this suit acted to accrue the independent breach of those rights." There does not, however, appear to be any legal principle by which a plaintiff can sue for breach of contract based on a plaintiff's presumption that a defendant will later breach a contract between the two parties.

### III. CONCLUSION

For the aforementioned reasons, we affirm the judgment of the Court of Federal Claims.

<u>AFFIRMED</u>