# United States Court of Appeals
# for the Federal Circuit

---

**AIRPORT ROAD ASSOCIATES, LTD., CLIFFORD E. OLSEN--DELTA SQUARE, OAKDALE ASSOCIATES, LIMITED, SERENITY VILLAGE, A PARTNERSHIP IN COMMENDAM, SOUTHEASTERN ASSOCIATES, LTD., A LOUISIANA LIMITED PARTNERSHIP, SOUTHSIDE APARTMENTS, LTD.,**
*Plaintiffs*

**BAYOU DES GLAISES, LTD., BLOOMFIELD PARTNERSHIP II, A LOUISIANA PARTNERSHIP IN COMMENDAM, CLIFFORD E. OLSEN--COLLEGE TOWNE, CLIFFORD E. OLSEN--COLLINS SQUARE, A LOUISIANA PARTNERSHIP IN COMMENDAM, CLIFFORD E. OLSEN--HAMMOND TOWNE, CLIFFORD E. OLSEN--JEFFERSON SOUTH, CLIFFORD E. OLSEN--OLD MAN RIVER, CLIFFORD E. OLSEN--WALKER PARTNERSHIP, CLIFFORD E. OLSEN 1977-B, CYPRESS COVE ASSOCIATION,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2016-1542

---

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00152-NBF, Senior Judge Nancy B. Firestone.

———————————

Decided: August 10, 2017

———————————

MARK BLANDO, Eckland & Blando LLP, Minneapolis, MN, argued for plaintiffs-appellants. Also represented by JEFF HOWARD ECKLAND, VINCE REUTER.

MATTHEW PAUL ROCHE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., FRANKLIN E. WHITE, JR.

———————————

Before PROST, *Chief Judge,* LOURIE and TARANTO, *Circuit Judges.*

PROST, *Chief Judge.*

Appellants seeking to exit a federal housing program through loan prepayment appeal from the decision of the United States Court of Federal Claims ("Claims Court") dismissing their claims against the United States ("government") for lack of subject matter jurisdiction. We reverse and remand.

## I. BACKGROUND

Appellants are ten limited partnerships[1] that took

———————————

[1] Bayou des Glaises, Ltd.; Bloomfield Partnership II; Clifford E. Olsen—College Towne; Clifford E. Olsen—Collins Square; Clifford E. Olsen—Hammond Towne;

loans from and entered into housing development agreements with the Rural Housing Service ("RHS") of the United States Department of Agriculture ("USDA") to provide affordable rental housing in Louisiana.[2] They all share a common general partner, Clifford E. Olsen, and wish to prepay their loans and thereby exit the federal affordable housing program.

A

Under § 515 of the Housing Act of 1949, ch. 338, 63 Stat. 413, amended by the Senior Citizens Housing Act of 1962, Pub. L. No. 87-723, § 4(b), 76 Stat. 670, 671 (codified as amended at 42 U.S.C. § 1485), the RHS makes loans to private, nonprofit entities to construct affordable rental housing for elderly and low- or middle-income people. Between 1972 and 1982, each Appellant entered into a fifty-year § 515 loan agreement with the RHS. The loans all include a "prepayment" provision stating that each Appellant had the option of paying off the remaining loan balance and converting its properties to conventional housing any time after the first fifteen or twenty years.[3]

---

Clifford E. Olsen—Jefferson South; Clifford E. Olsen—Old Man River; Clifford E. Olsen—Walker Partnership; Clifford E. Olsen 1977-B; and Cypress Cove Association.

[2] The RHS was formerly known as the Farmers Home Administration ("FmHA"). *See* Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, § 233, 108 Stat. 3178, 3219–20 (establishing a successor agency to the FmHA); *see also* Agency Name Change, 61 Fed. Reg. 2899 (Jan. 30, 1996) (renaming the successor agency to be the RHS). To avoid confusion, we refer to both the FmHA and the RHS throughout this opinion as the RHS.

[3] Although borrowers can prepay at any time, the applicable law when Appellants entered into the loans included a fifteen- or twenty-year restrictive-use provision

*See, e.g.*, J.A. 52 ("Prepayments of scheduled installments, or any portion thereof, may be made *at any time at the option of the Borrower*." (emphasis added)).

By 1987, however, Congress was concerned that § 515 borrowers were choosing to prepay too often, which threatened the availability of affordable housing under the program. *See Franconia Assocs. v. United States*, 536 U.S. 129, 136 (2002) (citing H.R. Rep. No. 100-122, at 53 (1987), *reprinted in* 1987 U.S.C.C.A.N. 3317, 3369). In response, it passed the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA"), Pub. L. No. 100-242, 101 Stat. 1877 (1988) (codified as amended at 42 U.S.C. § 1472(c)). Important to this case, ELIHPA provides that before accepting an offer to prepay a § 515 loan, the USDA Secretary ("Secretary") must "make reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding commitment to extend the low income use of the assisted housing and related facilities." 42 U.S.C. § 1472(c)(4)(A). The Secretary can offer the borrower incentives with such an agreement. *Id.* § 1472(c)(4)(B). And generally, if an agreement cannot be reached, the borrower must offer to sell the housing to "any qualified nonprofit organization or public agency at a fair market value determined by 2 independent appraisers." *Id.* § 1472(c)(5)(A)(i). If no nonprofit organization makes an offer to buy within 180

---

(depending on the type of loan) that generally prohibited the government from accepting prepayment unless the borrower agreed to maintain low-income use of the rental housing for fifteen or twenty years from the date of the loan. Housing and Community Development Amendments of 1979, Pub. L. No. 96-153, § 503, 93 Stat. 1101, 1134–35 (codified as amended at 42 U.S.C. § 1472(c)) (amending § 502 of the Housing Act of 1949).

days, then the Secretary "may accept the borrower's offer to prepay." *Id.* § 1472(c)(5)(A)(ii).

As of April 2002, the time relevant to this appeal, the RHS had regulations in place at 7 C.F.R. § 1965 Subpart E, implementing ELIHPA. Under these regulations, the RHS outlined "the chronological order for the actions to be taken" on a request for prepayment. 7 C.F.R. § 1965.204(a) (2002). The regulations specified that "[p]rior to initiating a formal prepayment request, borrowers considering prepaying their loans should meet with the [RHS] . . . to discuss the prepayment request and the requirements of this procedure. The borrower will be provided with exhibit C of this subpart, to aid in completing the prepayment request package." *Id.* § 1965.205(a). Sections 1965.205 and 1965.206 set forth the requirements for submitting a formal prepayment request. Notably, for a prepayment request to be considered complete, the regulations required borrowers to make the request at least 180 days before the anticipated prepayment date and to provide, among other things, "[a] written request to prepay . . . on a specified date"; information "needed to develop an incentive offer"; and "[d]ocumentation of the borrower's ability to prepay under the conditions specified in the prepayment request." *Id.* § 1965.205(c). If the agency received a prepayment request that was not "complete," it would "return the request to the borrower specifying the additional information needed." *Id.* § 1965.206(a).[4]

---

[4]    These regulations were consolidated into streamlined regulations and handbooks in 2004. Reinvention of the Sections 514, 515, 516, and 521 Multi-Family Housing Programs, 69 Fed. Reg. 69,032 (Nov. 26, 2004).

## B

This appeal relates to correspondence between Mr. Olsen, on behalf of Appellants, and the RHS in April 2002. A nonprofit organization at the time had expressed interest in acquiring some of Appellants' properties. On April 2, 2002, during those negotiations, Mr. Olsen sent the RHS a letter notifying the agency of these Appellants' "intent . . . to convert [some] units into conventional housing" and seeking approval of their "request to pay off the mortgage(s)" on certain properties. J.A. 31. The letter stated in its entirety:

> We ask that you approved [sic] our request to pay off the mortgage(s) on the above-captioned developments. We desire to retain a few of the developments and we have an arrangement with a local and national non-profits [sic] to acquire the rest of the developments. Our intent is to convert these units into conventional housing. As we understand the nonprofits' motive, they, too, are seeking conventional housing. The total unit count for all of the developments above is 462 units.

*Id.*

About two weeks later, the RHS responded with a letter stating: "This will acknowledge your letter dated April 2, 2002, regarding your request to pre-pay . . . ." J.A. 32. The letter then pointed Mr. Olsen to a checklist of items that "must be completed for each loan you are requesting to pre-pay." *Id.* The RHS attached a copy of instructions, including the checklist, for submitting prepayment requests. Mr. Olsen never responded to the RHS's letter, as the potential acquirer decided shortly thereafter against purchasing the properties.

Almost a decade later, in May 2011, Mr. Olsen submitted more definite prepayment requests on behalf of

four of the Appellants. His requests indicated that he intended to prepay 180 days after the date of the requests. For one of the Appellants, the RHS responded with an incentive offer. Mr. Olsen accepted the incentive offer, thereby remaining in the housing program. For the other three Appellants, the RHS informed Mr. Olsen that no incentive offer would be made and that prepayment was also not an option. Based on the RHS's responses, Mr. Olsen purportedly believed that continuing to pursue prepayment on any of Appellants' properties would prove futile. He thus stopped pursuing the prepayment for those four Appellants and did not submit any additional prepayment applications for the other six Appellants.

C

In 2013, Appellants filed the underlying lawsuit against the United States, alleging that the government, through either Congress's enactment of ELIHPA or the RHS's 2011 responses, violated their right to prepay their § 515 loans. Specifically, the four Appellants who sent prepayment requests to the RHS in 2011 allege that their claims began to accrue when the RHS failed to honor their requests to prepay at that time. The other six Appellants contend that their claims began to accrue when they filed the underlying suit, at which time they chose to treat ELIHPA's repudiation as a breach. Appellants asserted two causes of action: breach of contract ("the contract claims") and just compensation under the Fifth Amendment ("the takings claims").

The Tucker Act confers jurisdiction upon the Claims Court over "any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a). Under 28 U.S.C. § 2501, all Tucker Act claims must be filed within six years of the date they "first accrue[d]." The government moved to dismiss Appellants' claims for lack of subject matter jurisdiction. *See John R. Sand & Gravel Co. v.*

*United States*, 552 U.S. 130 (2014) (holding § 2501 jurisdictional). Specifically, it argued that the alleged breach of the obligation to accept prepayment first accrued in April 2002, and Appellants' claims were thus time-barred in 2013, when the complaint was filed. The Claims Court agreed that the statute of limitations had run and dismissed all of Appellants' claims.[5]

Appellants timely appealed. This court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

Appellants seek reversal of the Claims Court's decision, arguing that the six-year statute of limitations did not begin to accrue in April 2002 because the RHS's letter response at that time did not constitute a breach of the RHS's obligation to accept Appellants' prepayment. If Appellants are correct, then there is no dispute that their 2013 contract claims would be timely. Appellants additionally argue that the Claims Court mistakenly dismissed their takings claims without separately addressing those claims. We take each issue in turn.

We review issues of subject matter jurisdiction de novo. *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1335 (Fed. Cir. 2008). "When a party has moved to dismiss for lack of subject matter jurisdiction, we view the alleged facts in the complaint as true, and if the facts reveal any reasonable basis upon which the non-movant may prevail, dismissal is inappropriate." *Pixton v. B & B Plastics, Inc.*, 291 F.3d 1324, 1326 (Fed. Cir. 2002).

---

[5] In addition to Appellants, there were thirteen other plaintiffs—all of whom also share Mr. Olsen as a common general partner—in the underlying lawsuit, for a total of twenty-three plaintiffs. The other thirteen plaintiffs agreed to dismiss their claims and are not parties to this appeal.

A

We turn first to the statute-of-limitations issue regarding the contract claims. In *Franconia*, the Supreme Court addressed the timeliness of a § 515 borrower's claim for breach of the RHS's obligation to accept prepayment. 536 U.S. at 132. Prior to that decision, this court had held that Congress's enactment of ELIHPA in 1988 constituted an immediate breach of § 515 loan agreements and triggered the accrual of the six-year statute of limitations. *Franconia Assocs. v. United States*, 240 F.3d 1358 (Fed. Cir. 2002), *rev'd*, 536 U.S. 129 (2002); *see also Grass Valley Terrace v. United States*, 7 F. App'x 928 (Fed. Cir. 2001), *rev'd sub nom.*, *Franconia Assocs. v. United States*, 536 U.S. 129 (2002). The Supreme Court reversed, holding that the enactment of ELIHPA "effected a repudiation of the [§ 515] loan contracts, not an immediate breach." *Franconia*, 536 U.S. at 143. The Court relied, in part, on the purpose of the repudiation doctrine, which is "to avoid an unnecessary lawsuit by allowing the promisor an opportunity to adhere to its undertaking." *Id.* at 148. The Court reasoned that "[j]ust as Congress may announce the government's intent to dishonor an obligation to perform in the future through a duly enacted law, so may it retract that renouncement prior to the time for performance." *Id.* The Court thus held that "[u]nless [a borrower] treated ELIHPA as a present breach by filing suit prior to the date indicated for performance, breach would occur when a borrower attempted to prepay, for only at that time would the government's responsive performance become due." *Id.* at 143.

Appellants argue that the April 2002 correspondence between Mr. Olsen and the RHS at most constituted a repudiation, rather than a breach, of the RHS's obligation to accept Appellants' prepayment. They take the position that under *Franconia* a request for prepayment must indicate a time for performance in order to trigger the RHS's obligation to accept prepayment, and Mr. Olsen's

2002 letter did not specify *when* Appellants intended to prepay. Appellants also argue that nothing in the RHS's 2002 response could be construed as a rejection or disallowance of prepayment.

Taking the contrary view, the government relies primarily on our post-*Franconia* decision in *Tamerlane, Ltd. v. United States*, 550 F.3d 1135 (Fed. Cir. 2008). There, we stated that "[t]he *Franconia* decision requires no more formalism than the written request to prepay followed by non-acceptance of the request by the government to trigger the running to the statute of limitations." 550 F.3d at 1143. According to the government, *Tamerlane* therefore made clear that the formalism of a prepayment request is not important; all that is required to trigger the RHS's obligation to accept prepayment is a written request to prepay, after which anything but outright acceptance would constitute a breach of contract. Here, the government contends, Mr. Olsen's 2002 letter was a clear written request to prepay so, like the letters at issue in *Tamerlane*, it triggered the RHS's duty to accept the prepayment. It further submits that, because we have described the ability to prepay as an "unfettered right," *id.*, the RHS breached the loan agreements "simply by *not accepting* the request." Appellee's Br. 27. We disagree.

The Supreme Court's decision in *Franconia* expressly distinguished between repudiation and breach by drawing the line at "the time for performance"—until the government's obligation to "allow" or "accept" prepayment comes "due," it has at most repudiated its obligation to accept prepayment. 536 U.S. at 139, 148. The *Franconia* Court relied on well-established contract principles to observe that a "promisor's renunciation of a 'contractual duty *before* the time fixed in the contract for . . . performance' is a repudiation," whereas a "[f]ailure by the promisor to perform *at the time indicated for performance* in the contract establishes an immediate breach." *Id.* at 142–43 (second emphasis added) (quoting 4 A. Corbin, Contracts

§ 959, p. 855 (1951)) (citing Restatement (Second) of Contracts §§ 235(2), 250 (1979)).

As Appellants argue, *Tamerlane* "cannot be read as eliminating *Franconia*'s requirement of a time fixed for performance." Appellants' Reply Br. 8. Appellants surmise that the borrowers in that case had submitted complete requests for prepayment that included a date for prepayment, at least 180 days after the date of the requests, consistent with the then-governing regulations. We need not rely on such speculation. In *Tamerlane*, we held that a physical transfer of money was not required to trigger the government's duty to accept prepayment; rather, "clear, unconditional offers of prepayment" can suffice. 550 F.3d at 1143. But the parties did not dispute, and this court did not address, whether the particular requests for prepayment in that case sufficiently fixed a time for performance. *Tamerlane* could not have eliminated the *Franconia* Court's reliance on general contract principles.

Mr. Olsen's 2002 letter did not expressly indicate when he planned to prepay. And in context, we think it unreasonable to view the letter, with no specification of the time for prepayment, as going beyond an exploratory notification and triggering the contractual duty on the part of the government "to accept prepayment and execute the appropriate releases." *Franconia*, 536 U.S. at 142.

The Supreme Court in *Franconia* relied on the government's own equating of "a duty to allow petitioners to prepay and a duty to accept tendered prepayments." *Id.* at 144. Appellants did not "tender prepayments" with Mr. Olsen's 2002 letter or indicate a time they would tender them if the government indicated it would accept them. Indeed, there were many properties involved, for which the borrowers' actual ability and readiness to prepay could be expected to depend on completion and effectua-

tion of the referred-to arrangements or other financing deals. Two of the properties were actually still within their covenants periods and not even eligible for prepayment by their terms, as the RHS would know.

More generally, the government's view of Mr. Olsen's 2002 letter as immediately triggering the government's duty is unreasonable, in context, from each side's perspective. From the government's perspective, it is unreasonable to make the government liable for breach for responding with a request for more information in late April 2002 (as it did). Such a view would make the government possibly responsible for damages the borrowers would have suffered from losing a limited-time opportunity in late April or early May of that year, even though the borrowers never more definitely specified a time by which the government had to accept prepayment and effect the associated releases. It is likewise unreasonable from the borrowers' perspective to treat Mr. Olsen's 2002 letter— with no definite time for prepayment specified making clear when the government had to perform in response— as having the effect the government proposes: exhausting a one-time right of prepayment, never available again after an initial exercise, during the long life of the loan. Yet the government must insist on that one-time-exercise view of the prepayment right, or else this suit would be timely based on the 2011 requests and 2013 complaint regardless of what occurred in 2002.

Under the circumstances, the letter must be read, objectively, as not requesting effectuation of prepayment either immediately or by a specified time. The Claims Court did not conclude otherwise, except by relying on *Tamerlane*—which does not justify such a conclusion.[6]

---

[6]    That is so notwithstanding the government's stressing that Mr. Olsen's 2002 letter is similar to the letters in *Tamerlane*. *Tamerlane* held only that formal

Mr. Olsen's 2002 letter thus did not trigger the government's obligation to accept prepayment. Simply put, without specifying when Mr. Olsen wanted to prepay, the letter was akin to an open-ended exploratory notification that he intended to prepay.

Furthermore, we disagree with the government's position that any response other than outright acceptance (even informing a borrower about procedural requirements) qualifies as conduct constituting breach. Such a requirement reads our "unfettered right" language in *Tamerlane* too rigidly. Indeed, in that case, we did not rest our decision on the RHS's initial responses to the plaintiff's prepayment requests as constituting a breach. Rather, we held that the RHS had breached "at least" by the dates of the incentive loans, which occurred more than two years later. 550 F.3d at 1143.

Here, as Appellants contend, "[t]he [RHS's 2002 response] letter . . . contain[ed] no rejection or disallowance of prepayment, either explicit or implicit." Appellants' Opening Br. 35. The RHS's response merely acknowledged Appellants' contractual right to prepay and provided instructions on how to proceed with the process. Such a response offering guidance cannot be characterized as non-acceptance of Appellants' request to prepay.

The regulations in force at the time further bolster the conclusion that there was not yet any non-acceptance of prepayment. The RHS required a "complete" prepayment request—a written request with a time for performance, plus additional documentation, including proof of ability to repay—before it would substantively review the

---

tender was not required. It did not hold that an informal request set the time for performance as of that very day, and as noted *infra*, we did not rest our decision in *Tamerlane* on the initial request letter.

request, and an incomplete request would be returned with a request for more information. 7 C.F.R. §§ 1965.205(c), 1965.206(a) (2002). Although these regulations, like ELIHPA itself, might arguably constitute a repudiation of the RHS's obligation to accept prepayment, they support Appellants' argument that the RHS's response was nothing more than a request for more information.[7]

In sum, the Supreme Court in *Franconia* explained that "the essential purpose of the repudiation doctrine" is "to avoid an unnecessary lawsuit by allowing the promisor an opportunity to adhere to its undertaking." 536 U.S. at 148. During the 2002 correspondence between Appellants and the RHS, Appellants did not trigger the RHS's duty to accept prepayment, and the RHS did not take any steps inconsistent with allowing prepayment. Indeed, the RHS retained the option to retract its repudiation after the 2002 correspondence. The government therefore did not breach its contractual obligation to accept Appellants' prepayment in 2002. Because the alleged breaches occurred for some Appellants in 2011 and for the others when the underlying suit was filed in 2013, Appellants' contract claims are not time-barred under the six-year statute of limitations.

B

The Claims Court also dismissed Appellants' takings claims that had been pled separately from the breach-of-contract claims. In doing so, it did not separately allude to or analyze the takings claims. According to Appellants, this constituted error because "there is no reason to assume without discovery that [Appellants'] takings

---

[7]    We need not decide what other government actions or non-actions would constitute non-acceptance of a prepayment request.

claims accrued on the same day and based on the same event as their contract claims." Appellants' Opening Br. 42.

Because the Claims Court implicitly premised the dismissal of Appellants' takings claims on the same erroneous rationale as the dismissal of their contract claims, we also reverse the dismissal of the takings claims. We leave for the Claims Court on remand to address the viability of the takings claims in the first instance.[8]

## III. CONCLUSION

For the foregoing reasons, we reverse the dismissal of Appellants' claims and remand for further proceedings.

## REVERSED AND REMANDED

---

[8] The Supreme Court in *Franconia* did not provide guidance as to when the statute of limitations begins to run on takings claims brought by a § 515 borrower. *See* 536 U.S. at 149 ("The Federal Circuit's holding that takings relief was time barred hinged entirely upon passage of ELIHPA. Because that conclusion was incorrect, we hold, the Federal Circuit erred in dismissing petitioners' takings theory on grounds of untimeliness.").