NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**SALINE ASSOCIATES NO. 1 LIMITED PARTNERSHIP, ST. CLAIR WEST LIMITED PARTNERSHIP, STOCKBRIDGE ASSOCIATES LIMITED PARTNERSHIP,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

_____

2017-1688

_____

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00908-EGB, Senior Judge Eric G. Bruggink.

_____

Decided: March 19, 2019

_____

MARK BLANDO, Eckland & Blando LLP, Minneapolis, MN, argued for plaintiffs-appellants. Also represented by JEFF HOWARD ECKLAND, VINCE REUTER, LARA SANDBERG; WILLIAM LEWIS ROBERTS, Faegre Baker Daniels LLP, Minneapolis, MN.

MATTHEW PAUL ROCHE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JOSEPH H. HUNT, ROBERT E. KIRSCHMAN, JR., FRANKLIN E. WHITE, JR.

------------------------

Before NEWMAN, LOURIE, and STOLL, *Circuit Judges.*

NEWMAN, *Circuit Judge.*

In this action brought under the Tucker Act and the Fifth Amendment, the plaintiffs are three limited partnerships: Saline Associates No. 1 Limited Partnership, St. Clair West Associates Limited Partnership, and Stockbridge Associates Limited Partnership, (collectively, "Saline"). Their suit in the United States Court of Federal Claims ("CFC") alleges breach of contract and property taking arising from the government's repudiation of the prepayment terms of loan agreements that were made under section 515 of the Housing Act of 1949. The CFC granted summary judgment that there was no breach of contract and no taking, and alternatively that even if the government had violated its contracts, all of Saline's claims were barred by the Tucker Act's six-year statute of limitations.[1] On appellate review, we affirm that no liability is incurred with respect to these plaintiffs.

BACKGROUND

## A.  The Statutory and Constitutional Framework

The Rural Housing Service ("RHS") of the United States Department of Agriculture, through its predecessor the Farmers Home Administration ("FmHA"), is authorized to make low-interest mortgage loans to private

------------------------

[1]    *Saline Assocs. No.1 Ltd. P'ship v. United States*, 129 Fed. Cl. 737 (2016) ("CFC Op.").

nonprofit entities to provide rental housing for low-income tenants, pursuant to § 515 of the Housing Act of 1949 (codified at 42 U.S.C. § 1485).  The mortgage loan agreements contain restrictions on, *inter alia*, eligible renters and rents that can be charged.

Beginning in 1985, plaintiffs entered into several loan agreements pursuant to § 515.  Each owner was required to preserve the property in accordance with the terms of the § 515 program for twenty years, and after twenty years the owners had the right to prepay the loan and release the property from the restrictions.

By the mid-1980's Congress became concerned about the extent of § 515 loan prepayment, for it reduced the availability of low-income housing.  *See Franconia Associates v. United States*, 536 U.S. 129, 136 (2002).  Thus, Congress enacted the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA") (codified at 42 U.S.C. § 1472(c)).  ELIHPA affected § 515 loan prepayments by providing that before RHS can accept an offer to prepay such mortgage:

> the Secretary shall make reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding commitment to extend the low income use of the assisted housing and related facilities involved for not less than the 20–year period beginning on the date on which the agreement is executed.

42 U.S.C. § 1472(c)(4)(A).  The Secretary is authorized to offer incentives to the borrower, *see* § 1472(c)(4)(B) (the Secretary can, e.g., increase the rate of return on the property, reduce the interest rate of the loan, provide rental assistance, and grant equity loans).

Section 1472(c)(5)(A)(i) provides that if an agreement to extend the low income use of the housing is not reached, the owner must offer to sell the housing to "any qualified

nonprofit organization or public agency at a fair market value determined by 2 independent appraisers." If such offer to sell is not accepted within 180 days, the Secretary may accept the prepayment and release the property from the § 515 controls. § 1472(c)(5)(A)(ii). Any such sale requires RHS approval.

ELIHPA § 1472(c)(5)(G)(ii) further provides that an owner may avoid the offer-for-sale requirement if RHS determines that prepayment will not materially affect housing opportunities for minorities, and either of two other conditions is met: (1) prepayment will not displace the tenants of the affected housing, or (2) there is an adequate supply of safe, decent, and affordable rental housing within the market area and sufficient actions have been taken to ensure that such housing will be made available to displaced tenants.

In *Franconia Associates* the Supreme Court explained that "ELIHPA effected a repudiation of the FmHA loan contracts, not an immediate breach. The Act conveyed an announcement by the Government that it would not perform as represented in the promissory notes if and when, at some point in the future, petitioners attempted to prepay their mortgages." 536 U.S. at 143.

### B. The Saline Sales to Union Street

Saline's § 515 loan contracts were entered into on March 1st, June 27th, and July 24th of 1985. On October 12, 2007 the Saline owners entered into contracts to sell their properties to Union Street Enterprises, LLC ("Union Street") at an appraised price, and Union Street agreed to assume Saline's § 515 mortgage loans. The sales contracts stated that they were subject to RHS approval and required Saline to continue operating the properties until the closing.

On November 14, 2007, RHS approved the sales from Saline to Union Street. The sales closed on November 19,

2007, and Union Street executed new 20-year loan agreements with RHS, accepting new § 515 restrictions.

## C. The CFC Proceedings

On November 15, 2013 Saline filed suit against the United States stating two causes of action—breach of contract and Fifth Amendment taking—based on the enactment of ELIHPA and the imposition of prepayment restrictions in violation of Saline's § 515 loan agreements.

The government moved for summary judgment, arguing that under ELIPHA, as construed by *Franconia*, RHS could not breach its agreement to accept prepayment unless either (1) Saline offered to prepay the mortgage loan and RHS rejected the offer, or (2) if Saline treated the government's ELIPHA right to refuse prepayment as a present breach and filed suit. Neither event occurred before Saline sold the properties to Union Street, with the approval of RHS.

The CFC agreed with the government, holding that in accordance with *Franconia*:

> [P]laintiffs were thus limited to two options: they could file suit immediately or attempt to exercise their prepayment right and file suit when the government refused to accept prepayment. Because plaintiffs transferred their respective properties and loan agreements prior to taking either of those steps, they failed to place the government in breach when they had the right to do so.

CFC Op. at 741. The CFC also addressed Saline's argument that it placed the government in breach of contract by "materially changing its position" in reliance on the ELIHPA repudiation by selling the properties to Union Street. The CFC held that even if *Franconia* did not foreclose this theory, Saline's actions "did not establish a material change of position that could serve as an election to treat the government's repudiation as a breach" because

Saline "transferred all rights they had under the contracts to Union Street" and Saline's "transfers were consistent with continued performance by the government and Union Street." *Id.*

The CFC held that even if the sales to Union Street were treated as a material change in position due to the ELIHPA repudiation, Saline's claim of breach on this ground was barred by the Tucker Act six-year statute of limitations. The CFC found that Saline's claim accrued on the date of the sales contracts between the Saline owners and Union Street, October 12, 2007, or at the latest when RHS approved the sale, on November 14, 2007—because "[w]hen plaintiffs contracted to sell their properties, Union Street could enforce the sales contracts through an action for specific performance or seek money damages if faced with a breach by plaintiffs." CFC Op. at 741–42. Both dates are more than six years before Saline filed this suit on November 15, 2013. The CFC further held that Saline's theories of Fifth Amendment taking were either non-existent or time-barred on the same grounds. *See id.* at 742.

Saline appeals, alleging error in the CFC's analysis of both the breach of contract and the taking claims.

## DISCUSSION

The Tucker Act provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after the claim accrues." 28 U.S.C. § 2501. This period of limitations is deemed a jurisdictional requirement, *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34 (2008).

"Whether the Court of Federal Claims possesses jurisdiction over a claim is a question of law subject to *de novo* review." *Navajo Nation v. United States*, 631 F.3d 1268, 1272 (Fed. Cir. 2011). "Whether a taking compensable under the Fifth Amendment has occurred is a question of law

based on factual underpinnings." *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 895 (Fed. Cir. 1998). We review the CFC's rulings of law de novo, *Massachusetts Bay Transportation Authority v. United States*, 254 F.3d 1367, 1372 (Fed. Cir. 2001), and factual findings underlying the analysis are reviewed for clear error, *City of El Centro v. United States*, 922 F.2d 816, 819 (Fed. Cir. 1990).

## A. The Contract Claims

In *Franconia* the Court explained that "[u]nless petitioners treated ELIHPA as a present breach by filing suit prior to the date indicated for performance, breach would occur when a borrower attempted to prepay, for only at that time would the Government's responsive performance become due." 536 U.S. at 143. The CFC found that "[b]ecause plaintiffs transferred their respective properties and loan agreements prior to taking either of those steps, they failed to place the government in breach when they had the right to do so." CFC Op. at 741.[2] Applying *Franconia*, the CFC held that no breach of contract occurred because prepayment was not offered and refused. Nor did Saline treat ELIHPA as a present breach by filing suit during Saline's ownership of the properties.

In *Tamerlane, Ltd. v. United States*, 550 F.3d 1135 (Fed. Cir. 2008), this court sought to "define the contours of the tender and rejection that are sufficient to trigger" the running of the statute of limitations regarding an ELIPHA claim for breach of contract. We held that "[t]he *Franconia* decision requires no more formalism than the written request to prepay followed by non-acceptance of the request

---

[2]    The record supports this finding, for Saline's owner told the CFC that she "did not give any serious consideration to submitting a prepayment request to the agency on any of the properties." Decl. of Elsie J. Garner, ¶ 9 (July 13, 2016) (Appx.18).

by the government to trigger the running [of] the statute of limitations." *Id.* at 1143. We also observed that "other conduct" by the government, aside from refusing to accept a prepayment request, "could constitute breach," *id.* However, here Saline did not make a written request, and Saline has not alleged any other conduct by the government that might constitute breach.

In *Airport Road Associates, Ltd. v. United States*, 866 F.3d 1346 (Fed. Cir. 2017), this court stated that "[t]he Supreme Court's decision in *Franconia* expressly distinguished between repudiation and breach by drawing the line at the time for performance—until the government's obligation to allow or accept prepayment comes due, it has at most repudiated its obligation to accept prepayment." *Id.* at 1352 (internal quotation marks omitted). We held that the borrower's correspondence with RHS, including a "request to pay off the mortgage(s)," was insufficient to initiate RHS's obligation to accept prepayment, for the government responded with a request for additional information. A request to prepay the loans and denial are not here asserted. It appears undisputed that the only request Saline made of the government was for approval of the sale to Union Street—which RHS duly granted.

Responding to the government's argument that the failure to file an ELIPHA suit or offer prepayment did not place the government in breach of contract, Saline argues that breach nonetheless occurred because it made a material change of position due to ELIHPA, by selling the properties to Union Street at a lower value than the properties would have had if they were unrestricted by the terms of § 515.

A cause of action against the United States accrues when all events have occurred which fix the government's liability. *Kinsey v. United States*, 852 F.2d 556, 557 (Fed. Cir. 1988) (quoting *Oceanic Steamship Co. v. United States*, 165 Ct. Cl. 217, 225 (1964)) (determining liability in a

breach of contract claim); *Seldovia Native Ass'n, Inc. v. United States*, 144 F.3d 769, 774 (Fed. Cir. 1998) (determining liability in a taking claim).

In *Franconia*, the Court held that "ELIHPA effected a repudiation of the FmHA loan contracts, not an immediate breach." 536 U.S. at 143. The Court explained that the injured party may choose to treat the repudiation as a present breach, or may choose to await the previously established contract performance date:

> "[t]he time of accrual . . . depends on whether the injured party chooses to treat the . . . repudiation as a present breach." 1 C. Corman, Limitation of Actions § 7.2.1, p. 488 (1991). If that party "[e]lects to place the repudiator in breach before the performance date, the accrual date of the cause of action is accelerated from [the] time of performance to the date of such election." *Id.*, at 488–489. But if the injured party instead opts to await performance, "the cause of action accrues, and the statute of limitations commences to run, from the time fixed for performance rather than from the earlier date of repudiation. *Id.*, at 488.

*Id.* at 144; *see also Roehm v. Horst*, 178 U.S. 1, 13 (1900) (repudiation "give[s] the promisee the right of electing either to . . . wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract").

In *Franconia* the Court explained that "[w]ere ELHIPA so regarded [as an anticipatory repudiation], petitioners' suit would be timely if filed within six years of either the date performance fell due (the date petitioners tendered prepayment) or the date on which petitioners elected to treat the repudiation as a present breach. *Id.* at 139. Here Saline's sales occurred after the ELIHPA extension of the 20-year restriction on prepayment. Saline did not tender

prepayment, and Saline did not treat the ELIPHA repudiation as a present breach.

Saline argues that a non-repudiating party may elect to treat repudiation as breach "either by bringing suit promptly, or by making some change of position." S. Williston & R. Lord, A Treatise on the Law of Contracts § 63:33 (4th ed. 2002). The question then is when the events surrounding Saline's sale of the properties to Union Street started the accrual of the six-year statute of limitations. Saline asserts that the period of limitations did not start to accrue until the date of closing of the sale.

The CFC held that Saline's claim on the ground of material change in position was time-barred. The CFC discussed the applicable dates of such change of position, among (1) October 12, 2007, the date of the sales contract between Saline and Union Street; or (2) November 14, 2007, the date RHS approved the sale; or (3) November 19, 2007, the closing date of the sale. Because Saline filed suit on November 15, 2013, its claim is untimely if the material change in position occurred before November 15, 2007.

The CFC held that if such a change in position occurred, it happened on October 12, 2007—the date Saline contracted to sell the properties to Union Street—and certainly no later than November 14, 2007, when RHS approved the sale. CFC Op. at 741. Saline argues that a material change in position for a real property sale occurs only on the closing date, for "closing" is the "definite action indicating that the anticipatory breach has been accepted as final[.]" Williston § 63.55. Saline points out that until November 19, 2007, the date of closing, Saline was still performing in accordance with its agreement with RHS, and that the sales contract of October 12, 2007 so required. Thus, Saline asserts that until the closing of the sale and transfer of ownership, including Union Street's assumption of the mortgage and acceptance of the § 515 restrictions,

there was no material change in Saline's relationship with the government.

The CFC did not accept Saline's argument that no material change in position occurred before the date of closing. The CFC correctly observed that upon execution of the contracts for sale, Saline transferred interests in the properties to Union Street. Among other interests under the contracts, as noted by the CFC, Union Street became the equitable owner of the properties and Saline merely held legal title as security. *See* 17 Williston on Contracts § 50:42 (4th ed.) ("The rule in the vast majority of jurisdictions is that on entering into a contract for the purchase and sale of land, the purchaser is the owner in equity of the land, and the seller holds legal title as security for payment of the purchase price."); 8 Corbin on Contracts § 33A.7 (2018) ("The contract itself was a conveyance of almost all of the jural relations constituting property. It at once created 'equitable ownership' in the purchaser, leaving in the vendor only the 'bare legal title,' once historically important but now relatively negligible.").

The sales contracts herein are governed by Michigan property law, which applies the doctrine of equitable conversion as described by Williston and Corbin. *See Batton-Jajuga v. Farm Bureau Gen. Ins. Co. of Michigan*, 322 Mich. App. 422, 436–37, 913 N.W.2d 351, 358 (2017), *appeal denied*, 502 Mich. 938, 918 N.W.2d 523 (2018) ("Under Michigan law, the sale of real property under a land contract operates as an equitable conversion. Under the doctrine of equitable conversion, equity treats the sale as actually taking place when the land contract becomes effective." (internal citation and quotation marks omitted)). Thus when Saline entered into the contracts to sell the properties to Union Street on October 12, 2007, a material change occurred with respect to the interests in the properties. This effected a change in Saline's position concerning the repudiated right to prepay the § 515 loans, for

Saline states that the sales price took account of the continuing § 515 prepayment restrictions.

We conclude that the CFC correctly denied Saline's claim for breach of contract. On the law established by *Franconia*, Saline did not place the government in breach prior to contracting to sell the properties, and such material change in position occurred more than six years before this suit was filed. Thus the contract claim is time barred by the Tucker Act's six-year statute of limitations.

## B.  The Taking Claims

The CFC also granted summary judgment in favor of the government on Saline's taking claims. Saline advanced two theories: (1) taking of its contractual prepayment rights; and (2) regulatory taking based on restrictions on the use and disposition of their property.

With respect to the taking of the contract right, the CFC held:

> [P]laintiffs' contract rights cannot be greater in a takings analysis than in a contract analysis. If they do not have a contract right, there is no property to be taken. Vice versa, if they have a contract right, their remedy is to assert that right. They continued to have a contract remedy after the legislation was adopted, up until the time they sold all of their contractual rights. The fact that they elected not to place the government in breach prior to sale does not generate a hitherto nonexistent taking.

CFC Op. at 742. The CFC thus concluded that no taking of a contractual right occurred, as a matter of law.

This court has explained that "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances,

interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Baggett Transp. Co. v. United States*, 969 F.2d 1028, 1034 (Fed. Cir. 1992) (quoting *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978)) (citation omitted).

Precedent is consistent. *See Piszel v. United States*, 833 F.3d 1366, 1376 (Fed. Cir. 2016) ("We have held that when the government itself breaches a contract, a party must seek compensation from the government in contract rather than under a takings claim."); *Castle v. United States*, 301 F.3d 1328, 1342 (Fed. Cir. 2002) ("Thus, by enacting FIRREA, the government did not deprive the plaintiffs from a contractual remedy—injunctive relief—to which they otherwise might have been entitled against a private defendant. Nor did FIRREA remove the plaintiffs' cause of action for damages. We agree with the Court of Federal Claims that the plaintiffs retained the full range of remedies associated with any contractual property right they possessed. Consequently, we hold that even assuming the enactment and enforcement of FIRREA breached a contract the government had with Castle and Harlan, it did not constitute a taking of the contract."); *see Dureiko v. United States*, 209 F.3d 1345, 1359 (Fed. Cir. 2000) ("Pine Isle's alternative contention that FEMA violated the Fifth Amendment by breaching its contract with Pine Isle is also deficient, since FEMA's conduct here would only appropriately give rise to a claim under contract law, not the Fifth Amendment.").

Saline states that the CFC erred in law, and that a taking of a contract-based right can occur in the absence of a breach of contract, citing *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1369 (Fed. Cir. 2009), *on reh'g in part*, 638 F.3d 781 (Fed. Cir. 2011) ("In this case, the trial judge denied the contract claim, and then dismissed without trial the takings claim on the ground that the contract claim precluded the takings claim. That is error."). However, in *Stockton* the question was not whether a

contractual right was taken; rather, the question was whether it was error to deny the claim for breach of contract and subsequently dismiss the claim for a taking on the ground that the contract claim precluded any taking. *See id*. at 1369. Here, the CFC considered the contract and the property issues separately.

On Saline's argument for a regulatory taking, the CFC held that the economic impact of the restrictions placed on Saline's property began on enactment of ELIPHA, or alternatively at the time of extension of the 20-year restrictive use provision in the loan agreements; both dates occurred more than six years before this suit was filed. CFC Op. at 742.

The government states that the CFC incorrectly stated that a taking claim accrued at the time ELIPHA was enacted. Gov. Br. at 57 ("In any event, we do not dispute appellants' argument that the trial court incorrectly held that their real property takings claims accrued upon the passage of ELIHPA."). This court has observed that "[t]he Supreme Court in *Franconia* did not provide guidance as to when the statute of limitations begins to run on takings claims brought by a § 515 borrower." *Airport Rd. Assocs., Ltd. v. United States*, 866 F.3d 1346, 1354 n.8 (Fed. Cir. 2017). The Court in *Franconia* did, however, reject our holding that "takings relief was time barred" because it "hinged entirely on [our] conclusion that petitioners' contract claims accrued upon passage of ELIHPA." *Franconia*, 536 U.S. at 149.

Applying the *Franconia* conditions to the facts and relationships herein, we agree that the taking claim did not accrue on enactment of ELIHPA. The situation is analogous to that in *Greenbrier v. United States*, 193 F.3d 1348 (Fed. Cir. 1999), where this court held that the taking claim under ELIHPA was not ripe because:

> None of the Owners in this case have alleged that they followed the procedures provided for obtaining

> HUD permission to prepay their mortgage loans, much less that they have received final decisions from HUD denying them such permission. The enactment of the statutes did not constitute such final decisions. That HUD may have set a high hurdle by imposing stringent requirements for granting such permission does not excuse the Owners' failure to seek such permission.

*Id*. at 1358–59 (footnote omitted).

The issue here is simpler, in that Saline neither requested to prepay nor filed suit, but instead sold its properties and waited longer than six years after contracting for that sale before bringing suit.

Saline asserts that it would have been futile to make a prepayment request before disposing of the properties. Saline provided a Declaration from an owner, who stated:

> Because I understood that prepayment was no longer an option for the partnerships, I did not give any serious consideration to submitting a prepayment request to the agency on any of the properties. This was based on my discussions with my limited partners and advisors, including a former agency employee. It made no sense to me to spend the time and money to prepare and submit a prepayment application when I knew that it would be denied.

Decl. of Elsie J. Garner, ¶ 9 (July 13, 2016) (Appx.18).

In *Biafora v. United States*, 773 F.3d 1326, 1331 (Fed. Cir. 2014), this court rejected a similar claim of futility, and explained that "whether it would be futile for a property owner to seek prepayment approval must be determined on the basis of facts and calculations specific to each property." *Id*. at 1337. We further suggested that to establish futility, objective evidence is required, such as property

specific data, and analysis of whatever aspects RHS would have to consider. *See id*. at 1331, 1336–37.

Precedent has observed that "the futility exception simply serves to protect property owners from being required to submit *multiple* applications when the manner in which the first application *was rejected* makes it clear that no project will be approved." *Howard W. Heck & Assocs., Inc. v. United States*, 134 F.3d 1468, 1472 (Fed. Cir. 1998) (quoting *Southern Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 504 (9th Cir. 1990)) (internal quotations removed). Although futility may be rationally based, it does not overcome the jurisdictional weight of the statute of limitations in dealings with the government. *Aectra Ref. & Mktg., Inc. v. United States*, 565 F.3d 1364, 1373 (Fed. Cir. 2009) ("[F]utility does not excuse the failure to file a proper claim for limitations purposes.").

On the facts and events hereof, reversible error has not been shown in the CFC's ruling that a taking action is time-barred.

CONCLUSION

The decision of the Court of Federal Claims is

**AFFIRMED**

COSTS

No costs.